## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARIA G. FONSECA,

                Plaintiff,

    v.

SPRAYING SYSTEMS CO.,

                Defendant.

Case No. 18 CV 7779

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Fonseca sues her former employer, Spraying Systems Co., alleging disability discrimination (Count I), retaliation in violation of the Americans with Disabilities Act (Count II) and Title VII (Count III), and breach of contract (Count IV). *See* [1]. Defendant moves for summary judgment on all counts, [34]. For the reasons explained below, this Court grants Defendant's motion.

## I.    BACKGROUND[1]

### A.    Plaintiff's Job and Performance

Defendant Spraying Systems designs and manufactures spray technology, including spray nozzles and accessories. [36] at ¶ 2; [40-2] at 9. Plaintiff worked for Defendant from July 13, 1981 until February 16, 2017 as a machine operator or "Assembler/Utility Operator" (hereinafter, Assembler). [36] at ¶¶ 1, 15. Assemblers work within the Boom Components Department, a department Defendant

---

[1] The Court draws these facts from Defendant's Local Rule 56.1 statement of material facts [36] and Plaintiff's responses thereto and statement of additional facts [39].

characterizes as "light duty," as numerous employees with medical restrictions work there. *Id.* at ¶ 19.

In her capacity as an Assembler, Plaintiff set up training and operated machines such as the QJ360 flow line. *Id.* at ¶ 20. The job required her to stand, observe, and operate controls constantly; to walk and lift or carry occasionally; to push or pull, bend or stoop, and reach periodically; and to talk frequently. *Id.* at ¶ 20. She reported directly to Bill Larsen. *Id.* at ¶ 18.

During Plaintiff's employment, Defendant maintained a Policies and Procedures Manual, which contained, among other provisions, an "Employment at Will" provision, stating that:

> [e]mployment at will provides that the employment relationship is deemed to be for an indefinite duration and may be terminated by either party at any time, for any reason or for no reason at all. No oral or written promises regarding any terms or conditions of employment can be made, or should be relied on, except for those made in writing by a designated officer of the organization.

*Id.* at ¶ 6; [37-4] at 3. The Manual also contained a "disclaimer," stating that it was "not intended to create any contractual rights in favor of [the employee] or the company," and a reservation, whereby Defendant reserved the right "to change the terms of these policies and procedures at any time." [36] at ¶ 7.

Defendant's Manual also contained a discipline provision, which provided that employees: "may be separated from the Company with or without recourse to the following disciplinary procedures": (1) verbal warning of supervisor; (2) written warning of supervisor and Human Resources Department – copy to be placed in employee's file; (3) written report with days off with or without pay – copy to be placed

in employee's file; or (4) discharge. *Id.* at ¶ 9. The provision further provided that all "violations of Company rules are subject to any of the above-mentioned penalties depending on their severity." *Id.* The Manual lists various "personal conduct violations" including but not limited to "insubordination," "misconduct," "repeated violation of shop or safety rules," "nonproductive performance violations," including but not limited to "refusal to perform assigned tasks," "lack of cooperation with management and co-workers," and "any violations of commonly accepted principles" or "commonly accepted job responsibilities" not listed above. *Id.* at ¶ 10.

Plaintiff received Defendant's Manual upon hire and signed acknowledgment forms specifically stating that she read and understood the Disciplinary Procedures Policy and Rules for Personal Conduct. *Id.* at ¶ 11. Plaintiff knew that violations of Defendant's policies were "subject to any of the progressive disciplinary steps, but not necessarily all of steps in every circumstance." *Id.* at ¶ 14.

In addition, Plaintiff, like all other employees in her division, signed a Manufacturing Center/Flowline Team Member's Agreement ("Team Member Agreement"). *Id.* at ¶ 12. The Team Member Agreement listed certain "commitments" made by the team member (employee) and certain "commitments" made by the company, both "in the spirit of developing mission driven manufacturing center flowline teams." [37-6] at 2.

Throughout her employment, Plaintiff received numerous performance reviews noting issues with attendance and low productivity. [36] at ¶ 16. Plaintiff does not dispute that she received such reviews but does dispute that she deserved

them. *See* [39] at ¶ 16. Likewise, throughout her employment, Plaintiff received verbal and written warnings for performance issues such as carelessness, incorrectly shipping an order, leaving her work area, low production with an assembly rate less than 50 percent, and disobedience. [36] at ¶ 17. Again, Plaintiff does not dispute that she received such warnings, but she disputes that she deserved them. [39] at ¶ 17. In the record before this Court, however, she does not explain why she thinks her negative performance evaluations and warnings were undeserved; nor does she otherwise properly support such opinions with evidence.

### B.  Plaintiff's Injury & Work Restrictions

In July or August 2013, Plaintiff injured her right arm while working the QJ17560 machine.[2] [36] at ¶ 21. Afterward, she filed a workers' compensation claim and advised Defendant about the injury. *Id.* at ¶ 22. Defendant accommodated Plaintiff by providing her with six weeks of paid leave in 2013, during which time Plaintiff sought medical treatment. *Id.* at ¶ 23.

Plaintiff's doctors recommended a course of treatment involving cortisone injections, physical therapy, a brace, pain relievers, and anti-inflammatory ointment; and later, her treaters recommended surgery, though they never expected surgery to cure Plaintiff's condition completely. *Id.* at ¶¶ 26–27. In July 2016, Plaintiff had surgery, followed by months of physical therapy. *Id.* at ¶ 28. Defendant accommodated Plaintiff in 2013, 2014, 2015, and 2016 by giving her light duty work,

---

[2] According to her physical therapy summary report, Plaintiff was diagnosed with right radial tunnel syndrome and lateral epicondylitis or "tennis" elbow. [37-19] at 18.

and accommodated her in 2016 by providing her with several months of leave after her surgery. *Id.* at ¶ 29. Plaintiff returned to work November 16, 2016. *Id.*

During the period from her injury in July or August of 2013 to the time she returned to work in late 2016, Plaintiff saw at least eight different physicians for treatment. *Id.* at ¶ 24. Defendant claims that Plaintiff would switch to a new doctor every time she disagreed with her doctor's recommendations for restrictions or a return to work. *Id.* at ¶ 25. Plaintiff disputes this, contending that she saw some doctors of her own choosing and other doctors because the company insisted upon it. [39] at ¶ 25. Plaintiff testified at her deposition, however, that she saw numerous doctors because she "wouldn't believe what they were telling [her] about the tendon." [37-3] at 23.

During this same period, Plaintiff's doctors issued various medical restrictions, with certain of her restrictions becoming permanent in November 2016. [36] at ¶ 30. On November 16, 2016, Plaintiff's treating physician, Dr. Erling Ho, released Plaintiff to return to work with permanent restrictions as follows: no lifting 37 lbs. or more; no pushing or pulling 37 lbs. or more; and no over the shoulder work greater than 17 lbs. *Id.* at ¶ 31; [37-19] at 8. Dr. Ho's November 16, 2016 note also referenced Plaintiff's "FCE," which everyone agrees refers to the FCA Summary Report dated November 2, 2016; that report indicated that Plaintiff could "attempt a return to work within the FCA guidelines from a functional standpoint, pending physician recommendations." [37-19] at 18. The FCA Summary Report includes Plaintiff's physical therapist's determination that Plaintiff should functionally be limited to

occasional bending/stooping, squatting, crawling, crouching, balancing, and simple, firm, and fine grasping with her right hand; according to the FCA, she could perform all grasping frequently with her left hand. *Id.* at 18–19.

On January 16, 2017, Dr. Ho issued another note, releasing Plaintiff to return to work with permanent restrictions that remained largely the same as those specified in the November 16, 2016 note, with a couple of additions. [36] at ¶ 32; [37-19] at 10. The new note added a restriction on repetitive work with her right hand/arm and also said that Plaintiff "should refrain from using machine[s] and air guns." [37-19] at 10. Plaintiff's supervisor, Bill Larsen, indicated that, when he saw this note, he thought "this covers everything we do." [40-2] at 31.

Rather than giving up on Plaintiff, Defendant's human resources administrator, Dana Dixon, reached out to Dr. Ho for clarification, to determine whether the "no machines" restriction included "even just pushing a button." [36] at ¶ 33; [40-6] at 19–20. Dixon testified that the company operated several different types of machines and needed to know whether Plaintiff really could not work on any of them, or if she could work on some that the company considered "light duty" or "very light duty." [40-6] at 20. Dixon testified that the company needed to know Plaintiff's restrictions so it could properly accommodate her medical needs. *Id.* at 21.

In response to Dixon's inquiry, Dr. Ho issued another note on January 20, 2017 clarifying that Plaintiff could operate machines as long as the "machine work" complied with her permanent restrictions and the restrictions in the FCA Summary Report. [37-19] at 16; [36] at ¶ 34. The note reiterated, however, that Plaintiff could

not use "any air guns." [37-19] at 16. Dixon testified that, consistent with this note, the company believed Plaintiff could use machines, as long as such use fell within her FCA and restrictions. [40-6] at 21.

In an effort to accommodate Plaintiff's restrictions, Larsen and his team members videotaped the various jobs on the flow line and sent them to human resources to confirm which jobs they thought Plaintiff could perform. *See* [40-2] at 26–28. More specifically, Larsen testified that his team and human resources determined that Plaintiff should be able to work at stations 1 and 2 on the QJ360 flow line; station 1 requires "very little force" (less than one lb.) and involves threading and tightening the cap and an additional O-ring, and station 2, involving placing an additional O-ring, adding the plug, and placing the retaining clip, similarly takes little force (maybe a couple of lbs.). *Id.* at 13. The assembly involved gripping, but with a "very light" grip; and the part, fully assembled, weighed less than one pound. *Id.* at 14.

Despite Defendant's efforts to accommodate, Plaintiff refused to work the flow line. [36] at ¶¶ 46, 50. Based upon the record, it is not clear why or how Plaintiff believed the QJ360 flow line work violated her restrictions (as laid out in Dr. Ho's final note and the FCA Summary Report). Plaintiff testified that the flow line was basically an assembly line for assembling spray nozzles; she testified that the work could be done while sitting or standing and that the part, fully assembled, weighed less than one pound. [37-3] at 35. Plaintiff also testified that she could perform work with her left hand and arm, and she admitted that her restrictions did not impact her

7

left arm or hand. *Id.* at 37, 38, 40 (she would do the plugs with her left hand; she could have done flow line work with her left hand).

Plaintiff testified that she disagreed with her doctor's assessment of her abilities; she testified that she could not operate machines, even if such operation fell within the parameters of her permanent restrictions. *Id.* at 27–28. Plaintiff also did not agree with her doctor's assessment that she could lift up to 37 pounds; perform over-the-shoulder work up to 17 pounds; or perform pushing/pulling activities up to 37 pounds. [36] at ¶ 35. The record, however, does not indicate that the flow line work required Plaintiff to do any of these things.

Additionally, although Plaintiff believed her injuries warranted more limiting restrictions than her doctors prescribed, she never sought or obtained a medical opinion to support further restrictions. *Id.* at ¶ 36. Nor did she ever ask her doctors for revised restrictions. [37-3] at 28. In fact, she conceded that she never talked to her doctors about the flow line and never asked for a note restricting her from working the flow line. *Id.* at 41.

Plaintiff concedes that Defendant accommodated her medical restrictions from 2013 until January 2017 by: (1) granting Plaintiff's request for paid time off after her injury; (2) providing Plaintiff light duty work after her injury; (3) granting Plaintiff's requests for time off for treatment (including surgery in July 2016) and recovery; and (4) providing Plaintiff with work consistent with her doctor's restrictions until January 2017. [36] at ¶ 37. She claims that Defendant stopped accommodating her

in January 2017, when her supervisors started asking her to work the QJ360 flow line again.

Defendant contends that performing work on the QJ360 flow line constituted an essential function of Plaintiff's Assembler position, and that, among other things, the Assembler position required working on the QJ360 flow line at least half of the time. *Id.* at ¶ 38. Plaintiff argues that the Assembler position involved a number of responsibilities that were not specific to the QJ360 flow line, or any flow line. [39] at ¶ 38. But Plaintiff's assertion, which speaks in terms of the number of job responsibilities, fails to contradict Defendant's statement, which speaks in terms of percentage of time spent on those responsibilities.

Defendant also contends that the QJ360 flow line is housed in the Boom Components Department, which it considers the "light duty department." [36] at ¶ 39. Plaintiff agrees that the line is housed in the Boom Components Department but disputes the characterization of this department as "light duty," given the physical demands listed in the job description. [39] at ¶ 39. The parties agree, however, that the QJ360 flow line work: (1) involves placing small, lightweight parts together via machine and manual assembly to create a plastic spray nozzle that weighs less than one pound fully assembled; and (2) can be done while standing or while sitting. [36] at ¶¶ 40, 41. They similarly agree that Plaintiff regularly worked on the QJ360 flow line prior to her injury in 2013 but did not work on the QJ360 flow line any time after being released to work in November 2016. *Id.* at ¶ 42.

Plaintiff's supervisor and team leaders asked Plaintiff to perform work on the QJ360 flow line numerous times after she returned to work in November 2016, but she refused. *Id.* at ¶ 45. Plaintiff contends that she could not do the work because of pain. [39] at ¶ 46. Instead, Plaintiff performed work that Defendant neither assigned nor asked her to perform. [36] at ¶ 49. Plaintiff persisted in her refusal to perform work on the QJ360 flow line from November 2016 through the end of her employment on February 16, 2017. *Id.* at ¶ 50. Yet Plaintiff never talked to her doctors about the QJ360 flow line job and never obtained a doctor's note excusing her from that work. *Id.* at ¶¶ 51–53. And the doctor's notes she did provide did not limit her from the work Defendant asked her to do.

Defendant contends that the QJ360 flow line work fell within the parameters indicated in Plaintiff's doctor's notes. *Id.* at ¶ 56. Plaintiff disputes that work on the QJ360 flow line fell within her restrictions, but she does not explain the bases for her claim or otherwise support her conclusion with evidence. [39] at ¶ 56. Instead, the record shows that Plaintiff told her supervisor that she refused to work on the QJ360 flow line because an attorney told her she did not have to do that work. [36] at ¶ 58; [37-3] at 42.

C.    <u>**Plaintiff's Termination, EEOC Charge & Subsequent Litigation**</u>

Defendant disciplined Plaintiff for refusing to perform QJ360 flow line work. [36] at ¶ 59. Defendant issued Plaintiff a first written warning on December 22, 2016, a second written warning on February 9, 2017, a third written warning on February 10, 2017, and a fourth written warning on February 13, 2017. *Id.* at ¶¶ 60–63. When

Defendant issued the fourth written warning, it placed Plaintiff on a two-day, paid, decision-making leave and instructed Plaintiff that, upon return, she needed to bring a "letter of intent" stating how she would work; she also needed to be prepared to work the QJ360 flow line as requested. *Id.* at ¶ 64. At the end of her leave, Plaintiff (who had been on such leave before and knew how serious it was)[3] returned to work but persisted in her refusal to work the QJ360 flow line and refused to produce the requested letter of intent. *Id.* at ¶¶ 65, 67.

Defendant fired Plaintiff on February 16, 2017. *Id.* at ¶ 68. Plaintiff's separation letter indicates that Defendant fired her because she refused to work the flow line and refused to provide a letter of intent after her decision-making leave. [37-17] at 2.

Thereafter, on June 2, 2017, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). *See* [1-1] at 1. In her charge, she stated:

> I began my employment with Respondent on or about July 13, 1981. My most recent position was Machine Operator. During my employment, I sustained a work related injury. Respondent became aware of my disability. I was provided a reasonable accommodation until in or around January, 2017. Subsequently, the accommodation was revoked and I was disciplined. On or about February 16, 2017, I was discharged.
>
> I believe I have been discriminated against because of my disability, and in retaliation for engaging in a protected activity, in violation of the Americans with Disabilities Act of 1990, as amended.

---

[3] Defendant previously placed Plaintiff on paid, decision-making leave in 2014 for attendance issues, and that time she produced the required letter of intent when she returned, knowing her job depended upon it. [36] at ¶ 66; [37-3] at 44.

11

*Id.* Plaintiff received a right-to-sue letter from the EEOC in mid-September 2018 (the EEOC sent her the letter on September 12, 2018). *Id.* at 2. She filed this lawsuit on November 23, 2018, alleging that Defendant failed to accommodate her disability in violation of the ADA (Count I), retaliated against in violation of both the ADA and Title VII (Counts II and III), and breached the Team Members' Agreement (Count IV). *See* [1]. Defendant filed its motion for summary judgment on January 3, 2020, seeking judgment in its favor on all four of Plaintiff's claims. *See* [34].

## II.   LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. <u>DISCUSSION & ANALYSIS</u>

Plaintiff claims that Defendant discriminated against her based upon her disability, retaliated against her for seeking a reasonable accommodation, retaliated against her for filing a worker's compensation claim, and disciplined her in a manner that breached the Team Member Agreement. Defendant argues that it is entitled to judgment on all four claims. The Court considers each claim in turn.

### A. <u>Plaintiff's ADA Discrimination Claim (Count I)</u>

Plaintiff first claims that Defendant discriminated against her in violation of the ADA, which prohibits employers from discriminating against a "qualified individual" based upon her disability. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020); 42 U.S.C. § 12112(a). To win on her claim, Plaintiff must show: (1) she was disabled; (2) she was otherwise qualified to perform essential functions of her job with or without reasonable accommodation; and (3) her disability was the "but for" cause of the adverse employment action. *Castetter*, 953 F.3d at 996 (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019); *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503–04 (7th Cir. 2017)). Here, Plaintiff suffered from right radial tunnel syndrome and lateral epicondylitis (tennis elbow). Defendant does not dispute that such conditions render her "disabled," and the Court assumes for present

13

purposes that she satisfies this element. Defendant argues, however, that Plaintiff cannot prove that she was otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation. Defendant also argues that Plaintiff cannot prove "but for" causation.

### 1.    Qualified Individual

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing 42 U.S.C. § 12111(8)). In response to an employer's motion for summary judgment, the plaintiff bears the burden to produce evidence sufficient to permit a reasonable jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863–64 (7th Cir. 2005)).

In determining whether a particular function is "essential," courts "generally defer to an employer's determination." *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012). *See also Lloyd v. Swifty Transp. Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision."). Further, consistent with EEOC regulations, the essential functions constitute a position's "fundamental job duties," rather than a position's "marginal functions"; to determine what is essential, courts consider,

14

among other factors: the employer's judgment as to which functions are essential; written job descriptions prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; the work experience of past incumbents in the job; and/or the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(1)–(3).

Defendant posits that working the QJ360 flow line constituted an essential function of Plaintiff's Assembler job, an assertion supported by the record. Bill Larsen, who not only supervised Assemblers, but worked as an Assembler himself and thus was personally familiar with the key requirements of the job, testified that Assemblers in his department, like Plaintiff, work on flow lines[4] to assemble spray nozzles and accessories; they also perform manual assemblies, do "pre-kitting" (gathering all necessary product for assembly), and sometimes pack completed parts for shipping. [40-2] at 9, 12. Larsen testified that he and the other supervisors randomly assign Assemblers to work on one of the 3 non-automated flow lines in the department, but Assemblers work on the QJ360 flow line at least 50% of the time. *Id.* at 12; [37-2] at ¶ 11.

Plaintiff's testimony is not inconsistent on this issue. Plaintiff admitted that her job required her to operate machines and work on the QJ360 flow line. At her deposition, Plaintiff testified that her job as an Assembler required her "to run the machine and to fill orders." [37-3] at 14. She testified that before her injury, she

---

[4] Larsen testified that a flow line is an assembly line, "a process of operations to begin and complete assembly." [40-2] at 12.

mostly worked station 2 on the QJ360 flow line and sometimes worked station 3; she did not mention any other work she performed before her injury. *Id.* at 34, 36.

Defendant's company literature confirms that running or operating machines constituted an essential function of the Assembler position. According to the job description overview, employees in that position "have a wide range of job responsibilities, including set up training and/or operation of any number of machines within the center." [37-9] at 2. The description lists a number of specific responsibilities and duties, the first being learning the operation of machines. *See id.* (specifying a number of responsibilities, the first one being "Responsible to learn the operation of many difficult types of machines. A partial list of the machinery includes: CNC machines, milling, drilling, deburring, hand lathe, and parts washing equipment, screw machines, soldering, and testing equipment."). Plaintiff argues that because this description does not mention the QJ360 flow line, that work must not have been an "essential function." Not so.

Larsen testified that "QJ360" refers to the name of the part manufactured on the line; his department also housed the QJ370 flow line (on which employees assembled part number QJ370), and the 21950 end cap flow line (which assembled the 21950 end cap), [40-2] at 12, and none of these specific part names or flow line names appears in the Assembler job description. Thus the reference in the description to machines by purpose rather than part number does not undermine Defendant's assertion that Assemblers in Plaintiff's department worked predominantly on the QJ360 flow line. Indeed, Plaintiff's testimony about what tasks

16

she performed before her injury (exclusively station 2 or station 3 on the QJ360 flow line) bolsters Defendant's characterization of this work as essential. And, notably, the above job description also does not mention anything about "doing caps" or "doing plugs"– the only tasks Plaintiff testified she was able to perform after her surgery. [37-3] at 56 (Plaintiff testified that she could "do caps, plugs, the easy things.").

Plaintiff correctly notes that the Assembler job also involved tasks other than working the QJ360 flow line. *See* [39] at ¶ 70; [38] at 9–10. But "essential" does not mean "exclusive." Larsen testified that, in addition to working the flow line, Assemblers performed manual assemblies, did "pre-kitting (gathering all product necessary for assembly), and packing completed parts. [40-2] at 12. Larsen also testified that, before she was released to return to work, Plaintiff performed the "light duty" work of assembling end caps, tip caps and gaskets, doing "bubble testing." *Id.* at 21. But the record contains no evidence demonstrating that any of these jobs were "essential functions" (as opposed to "marginal functions"). Plaintiff offered no evidence to rebut Larsen's testimony that the flow line work occupied more than half of an Assembler's shift; nor has she offered evidence demonstrating that "doing plugs and caps" also constituted an essential function of the Assembler job. Plaintiff might have, for example, offered the testimony of other Assemblers who did not work the QJ360 flow line (if this was indeed the case), but she failed to do so. And, in fact, Larsen stated that Defendant has not excused any Assembler from performing the function of working the QJ360 flow line as a medical accommodation or for any other reason. [37-2] at ¶ 30.

17

Based upon the record before it, the Court finds that working the QJ360 flow line constituted an essential function of the Assembler job, the job Plaintiff was hired to do. Having so found, the Court must consider whether Plaintiff *could* perform that work, with or without a reasonable accommodation.

Although Plaintiff claims that she could perform the essential functions of the Assembler job, she has consistently taken the position that she could not work the QJ360 flow line. She testified at her deposition that she could not work the flow line. [37-3] at 41. And she testified that there was no accommodation Defendant could have provided that would have allowed her to work the flow line. *Id.* Such evidence (if true) ordinarily would preclude Plaintiff's claim. *See Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997) (an employee "has no claim under the Americans with Disabilities Act" if she "cannot do the job even with a reasonable accommodation," even if "the lack of qualification is due entirely to a disability").

But the record also includes evidence (most submitted by Defendant) suggesting that Plaintiff *could* perform the QJ360 flow line work but refused to do so. For example, Bill Larsen testified that the tasks he sought to assign Plaintiff fell within the restrictions ordered by Plaintiff's doctor. [40-2] at 26–27. Additionally, Plaintiff conceded that the QJ360 flow line work did not exceed her lifting limitation or any other physical restriction included in Dr. Ho's notes. [37-3] at 35. Although the work required repetitive manual tasks, her restriction on such tasks was limited to her right hand only. *See* [37-19] at 10 (doctor's note indicating restriction on right hand only); *id.* at 19 (FCA Summary Report noting limitation in grasping on right

18

hand only). And Plaintiff testified that she could perform the manual tasks involved in that work with her left hand. *Id.* at 40. Such evidence—especially when combined with the substantial evidence that Plaintiff exhibited ongoing problems with her work ethic her entire career, *id.* at 46–49, and that she never made any attempt to propose a different solution or secure medical documentation for increased restrictions— supports the proposition that she *could* work the flow line, but simply refused.

### 2.    "But For" Causation

Even if genuine issues of material fact existed as to whether Plaintiff *could* perform the QJ360 flow line work (they do not), Plaintiff's ADA claim nonetheless fails because she cannot show that, "but for" her disability, Defendant would not have fired her. *See Castetter*, 953 F.3d at 996 (citing *Scheidler*, 914 F.3d at 541; *Monroe*, 871 F.3d at 503–04).

Plaintiff's supervisor, Bill Larsen, testified that Plaintiff's disability played no role in Defendant's decision to fire Plaintiff. [37-2] at ¶ 31. Dana Dixon, Defendant's human resources administrator, similarly stated that the company did not fire Plaintiff because of her disability. [37-19] at ¶ 21. Larsen stated that Defendant terminated Plaintiff because she refused to perform the work assigned to her and refused to comply with Defendant's policies and procedures. [37-2] at ¶¶ 28–30; [37-17] at 2; [40-2] at 36, 38. Plaintiff's separation letter gives the same reasons for termination. [37-17] at 2. Larsen testified that throughout her career, Plaintiff received numerous verbal and written warnings and previously received a decision-making leave for attendance issues. [37-2] at 23. Larsen testified that, after being

released to return to work with permanent restrictions, Plaintiff consistently refused to perform the work her supervisors assigned her, notwithstanding that such work fell within the parameters set by her doctor and physical therapist. *Id.* at 28–30. Larsen testified that Plaintiff received four warnings relating to her disobedience and insubordination, and, after the fourth warning in less than two months, Defendant imposed another two-day, paid, decision-making leave. Larsen further testified, at the end of the two day leave, Defendant expected Plaintiff to return to work with a letter of intent indicating her willingness to change the behavior that led to the disciplinary actions in the first place. [40-2] at 23, 36. But Plaintiff returned after the leave without a letter and without any change in her mindset or behavior. *Id.* at 36. When Plaintiff refused to provide a letter of intent and again refused to perform the work assigned her, Larsen fired her. *Id.*

Plaintiff offers no evidence to rebut Larsen's testimony or the representations by Larsen and Dixon that her disability did not factor into her termination. In fact, Plaintiff acknowledges that everything Larsen said about her performance record and her behavior was true. At her deposition, she acknowledged that she had performance issues throughout her career with Defendant, and she admitted that her performance reviews from 1986, 1987, 1988, 1989, 1991, and 1998 all indicated areas where her supervisors thought she "needs improvement." [37-3] at 46–47. She also conceded that, even before she was injured, she received warnings for carelessness and low productivity, and her personnel file includes at least five written warnings issued in 2005, 2009, 2013, 2014, and 2015, before the issue with the QJ360 flow line

ever arose. *Id.* at 48–49; [37-8] at 2, 3, 4, 5, 7. Plaintiff also admitted that Defendant placed her on a two-day, paid, decision-making leave in January 2014 because of tardiness, and she knew that such leaves were "serious." *Id.* at 44. She testified that, when she returned from that leave, she provided a letter of intent as requested because she wanted to keep her job. *Id.* She also admitted that she received four warnings in the two months immediately preceding her termination, and she admitted that Defendant placed her on a two-day, paid, decision-making leave in February 2017 because she refused to work the flow line; she knew Defendant expected her to return to work after the leave with a letter of intent, and she refused to provide one. *Id.* at 44–45. Plaintiff also admitted that, when she returned from her decision-making leave, she still refused to work the flow line. *Id.* at 45. Plaintiff testified that she knew her refusal to work the flow line constituted disobedience. [37-3] at 41.

Defendant has shown with unrebutted evidence that it possessed a valid, nondiscriminatory reason for firing Plaintiff, and Plaintiff has failed to show any genuine issues of fact that her disability constituted the "but for" cause of her termination. Indeed, Plaintiff has not even attempted to show that Defendant fired her because of her disability. Plaintiff must do more than show that she was disabled and that she was fired; she must offer some evidence (direct or indirect) showing a causal link between those two facts. She has not. As a result, Defendant is entitled to judgment as a matter of law on Plaintiff's disability discrimination claim. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) ("Summary

judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

### 3. The Interactive Process

Despite the above, Plaintiff argues that summary judgment is inappropriate because genuine issues of material fact exist concerning the adequacy of Defendant's efforts in the "interactive process" required under the ADA and the reasonableness of the accommodations Defendant offered Plaintiff.

Plaintiff argues that, by repeatedly attempting to make her work the QJ360 flow line, Defendant violated the interactive process required under the ADA. To be sure, an employee's request for an accommodation requires the employer to engage in a flexible, interactive process to identify a reasonable accommodation. *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Initially, the record fails to show that Plaintiff ever requested an accommodation with respect to the QJ360 flow line work. Bill Larsen testified that the only accommodation Plaintiff ever requested was a change in her hours (she asked to work 5:50 a.m. to 2:00 p.m., rather than 6:50 a.m. to 3:00 p.m., so she could carpool), a request Defendant granted. [40-2] at 9.

In any event, the "failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a

qualified individual." *Basden*, 714 F.3d at 1039 (citing *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). Here, the record shows no such failure. Indeed, the undisputed portions of record confirm Defendant's good-faith participation in the interactive process as to the Plaintiff's medical issues.

Furthermore, under the ADA, an employer is entitled to judgment as a matter of law if an employee refuses to cooperate in good faith during the interactive process. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012) (citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998)). Plaintiff testified at her deposition that no accommodation Defendant could have provided would have allowed her to work the flow line, [37-3] at 41; her mindset and refusal ensured that any interactive process would fail to achieve the desired result of returning Plaintiff to the essential functions of her job. Plaintiff refused to perform the work her supervisors asked her to do, yet she never explained why such work violated her permanent restrictions, never sought or obtained medical documentation supporting increased restrictions, and never requested or suggested other reasonable accommodations. Her actions reflect a total failure to cooperate in good faith during the interactive process. *See Steffes*, 144 F.3d at 1072 (affirming summary judgment on ADA claim where plaintiff "did not provide any further information to the company" and thus "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions").

In the end, Plaintiff's failure to accommodate claim stems from her belief that Defendant should have transferred her to a different department or position or should

have allowed her to continue to perform only the "light duty" work she performed during her treatment and recovery. She is wrong on both counts.

First, Defendant's transfer policy permitted employees in good standing to seek transfers for certain reasons. *See* [40-4] at 2. Plaintiff was not in good standing. [40-2] at 42. Moreover, Plaintiff admits that she never asked to be transferred, [40-1] at ¶ 12, and she has offered no evidence that the company had any open positions that she could (or would) perform. As a result, Plaintiff cannot establish an ADA violation based upon Defendant's failure to transfer her. *See Kotwica v. Rose Packing Co.*, 637 F.3d 744, 750 (7th Cir. 2011) ("[P]laintiffs, when alleging that an employer's failure to reassign them violated the ADA's anti-discrimination provisions, bear the burden of showing that there is a vacant position in existence for which they are qualified"); *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997) (under the ADA, the employer's duty to reasonably accommodate a disabled employee can include reassignment to a vacant position, but the "plaintiff bears the burden of demonstrating that a vacant position exists and that she is qualified for that position").

Nor does the failure to assign Plaintiff other duties violate the ADA. Plaintiff testified that, although she could not perform the flow line work, she could perform some tasks: she could "do caps, plugs, the easy things."[5] [37-3] at 56. She testified that the company should have created a position for her or kept her on the payroll to do these "easy things" without making her work the flow line. *Id.* at 46. But the ADA

---

[5] Plaintiff has not argued that these tasks are "essential duties," and the record contains no evidence to show that they are.

does not require an employer to eliminate or alter essential duties to accommodate an employee's disability or create a new position for a disabled employee. *See Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Cirs.*, 601 F.3d 674, 680 (7th Cir. 2010) ("employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee"); *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (employer "is not required to shuffle job responsibilities amongst employees to create a position to accommodate [a plaintiff's] disability").

Nor does the law require an employer to provide the particular accommodation the plaintiff thinks best. Rather, it "is the employer's prerogative to choose a reasonable accommodation." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005); *Jay*, 233 F.3d at 1017 ("employer is not required to provide theparticular accommodation that an employee requests"); *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) (where the employer provided a reasonable accommodation, the plaintiff's "apparent displeasure with the way in which [the employer] decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, [was] irrelevant"); *Rehling*, 207 F.3d at 1014 ("employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer.").

Because Plaintiff cannot show that her disability was the "but for" cause of her termination, she cannot win on her disability discrimination claim, and Defendant is entitled to summary judgment on this claim.

**B.**     **Plaintiff's ADA Retaliation Claim (Count II)**

The ADA precludes retaliation as well as discrimination; it provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual . . . participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  To win on her ADA retaliation claim, Plaintiff must prove that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) Defendant took the adverse employment action because she engaged in the statutorily protected activity.  *Guzman v. Brown Cnty.*, 884 F.3d 633, 642 (7th Cir. 2018); *Rowlands v. UPS*, 901 F.3d 792, 801 (7th Cir. 2018).  Following the Seventh Circuit's decision in *Ortiz v. Werner Enterprises*, 834 F.3d 760, 764 (7th Cir. 2016), the legal standard for such claims is simply whether the evidence as a whole "would permit a reasonable factfinder to conclude" that Plaintiff's protected activities caused the adverse action.  *Rowlands*, 901 F.3d at 801 (quoting *Ortiz*, 834 F.3d at 765).

Here, Plaintiff claims Defendant fired her for asking for a reasonable accommodation.  [1] at ¶ 56.  The evidence belies this claim.  First, the record fails to confirm that Plaintiff ever requested a reasonable accommodation.  The evidence shows that the only accommodation Plaintiff ever requested was a change in her work hours—and Defendant granted this request.  Moreover, whether or not Plaintiff requested an accommodation, the undisputed record shows that Defendant, in fact, accommodated Plaintiff for well over three years.  Defendant allowed Plaintiff to take

a six-week paid leave after her injury and allowed her to skip essential duties and perform light duty tasks upon her return in 2013 through her surgery and post-surgery recovery. In fact, Plaintiff concedes that Defendant accommodated her from the time she was injured in July or August of 2013, until November of 2016. Plaintiff claims that Defendant stopped accommodating her after her doctor released her to return to work with permanent restrictions. To the extent she made an implied request for the accommodation of allowing her to continue to perform just the "easy stuff," that accommodation would not have been reasonable. *See Gratzl,* 601 F.3d at 680 ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee.").

Moreover, as explained above, the evidence shows that Defendant fired Plaintiff because she refused to work the flow line and refused to comply with Defendant's policies. Plaintiff has offered no contradictory evidence to show that Defendant fired her because she requested a reasonable accommodation (indeed she offers no evidence to show that she ever requested a reasonable accommodation). As a result, Plaintiff's ADA retaliation claim fails.

### C. Plaintiff's Title VII Retaliation Claim (Count III)

In her complaint, Plaintiff alleged that Defendant retaliated against her for filing a worker's compensation claim in violation of Title VII. In its summary judgment motion, Defendant argued that Plaintiff's allegations could not support a Title VII claim. Plaintiff appears to concede the point. And rightfully so. *See* 42 U.S.C. § 2000e–2(a)(1); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 224

F.3d 701, 704 (7th Cir. 2000) (Title VII only prohibits retaliation against an employee for the employee' involvement in combatting discrimination based on sex, race, national origin, or some other protected class).

Instead, Plaintiff argues in her summary judgment response brief that she really means to assert a state-law claim for retaliatory discharge. But Plaintiff's attempt effectively to amend her complaint (by way of a response brief) to add a brand-new claim comes far too late. The parties' case management order, [19], entered April 10, 2019, set a November 26, 2019 deadline for adding any new allegations, claims, or parties. Plaintiff never sought to extend that deadline before it expired, and never hinted that she wanted to amend until she filed her response brief on January 28, 2020. And even if this Court were inclined to entertain Plaintiff's request to amend at this late juncture, Plaintiff has made no showing of good cause to support an eleventh-hour amendment or otherwise overcome the obvious prejudice to Defendant. As such, the request to amend is denied as untimely.

In the alternative, this Court also denies the request, because the record confirms that the claim she seeks to add would fail on the merits, and amendment would thus be futile. To assert the tort of retaliatory discharge under the Illinois Worker's Compensation Act, a plaintiff must show that she exercised a right granted by the Workers' Compensation Act and that Defendant discharged her for "filing a workers' compensation claim." *Andreu v. United Parcel Serv., Inc.*, No. 07 C 6132, 2008 WL 1774990, at *2 (N.D. Ill. Apr. 17, 2008) (citing *Hiatt v. Rockwell Intern. Corp.*, 26 F.3d 761, 767 (7th Cir. 1994)). Under Illinois law, the burden of proving all

elements of a retaliatory discharge claim remains with the plaintiff at all times. *Crampton v. Abbott Labs.*, 186 F. Supp. 2d 850, 856 (N.D. Ill. 2002) (citing *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407–08 (Ill. 1998)). Thus, the "onus is on the employee to show affirmatively that her termination was motivated by unlawful intent to retaliate against her for exercising her statutory right." *Andreu*, 2008 WL 1774990, at \*2 (citing *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 792 (7th Cir. 1999)). If a plaintiff fails to present evidence of a "causal connection between the plaintiff's workers' compensation claim and the termination, the action fails." *Id. See also Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992) (In Illinois, a plaintiff cannot satisfy the causation element of the retaliatory discharge claim if the employer provides a valid non-pretextual basis for discharging the plaintiff.).

Here, Plaintiff offers no evidence to show that her firing had anything to do with her worker's compensation claim. Bill Larsen and Dana Dixon both stated that her claim had nothing to do with her termination. [37-2] at ¶ 31; [37-19] at ¶ 21. Indeed, as explained above, Defendant has offered evidence demonstrating that it fired her because she refused to perform work as assigned and refused to comply with the company's policies and procedures. This evidence stands unrebutted.

Additionally, the timing alone undermines any retaliatory discharge claim. Plaintiff filed her worker's compensation claim in mid to late 2013, and Defendant fired her February 16, 2017. Without other evidence connecting the events or explaining the delay (here there is none), no reasonable jury could find the two causally related—especially given Defendant's treatment of Plaintiff in the

intervening years between her worker's compensation claim and her termination (the months of leave, the admitted accommodations, etc.). *See, e.g., Goetzke v. Ferro Corp.*, 280 F.3d 766, 775 (7th Cir. 2002) (one-year lapse between protected activity and adverse action undermines any causal connection between the two, a necessary element of a retaliatory discharge claim in Illinois); *Johnson v. Univ. of Wisconsin–Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995) ("substantial time lapse between protected activity and the adverse action is counter-evidence of any causal connection").

Finally, a five-year statute of limitations governs Illinois retaliatory discharge claims. *Lakin v. Skaletsky*, No. 08 C 842, 2008 WL 4662846, at *4 (N.D. Ill. Oct. 15, 2008), *aff'd*, 327 F. App'x 636 (7th Cir. 2009). Plaintiff suffered her injury in July or August of 2013, [36] at ¶ 21, and filed her worker's compensation claim either right away (according to Defendant, *id.* at ¶ 22), or within a few months of her accident (according to Plaintiff, *see* [39] at ¶ 22; [37-3] at 22). She filed this lawsuit on November 23, 2018. *See* [1]. Thus, in addition to being meritless, any retaliatory discharge claim may be time barred.

For all of these reasons, Defendant is entitled to judgment as a matter of law on any claim by Plaintiff based upon her alleged discharge in retaliation for pursuing a worker's compensation claim.

### D. **Plaintiff's Breach of Contract Claim (Count IV)**

In addition to her discrimination and retaliation claims, Plaintiff claims that her termination amounted to a breach of the Team Member Agreement that she and

30

the company executed.  More specifically, she alleges that the Agreement included a multi-step disciplinary process requiring monitoring, coaching, written warning, transfer to another shift or manufacturing center, probation, and then termination. [1] at ¶ 85.  Yet Defendant issued Plaintiff a mere written warning before firing her three days later.  *Id.* at ¶ 86.  Plaintiff alleges that Defendant violated its own agreement by failing to monitor, coach, and transfer her and place her on probation, before firing her.  *Id.* at ¶ 87.  Defendant argues that, whatever the Team Member Agreement said, Plaintiff constituted an at-will employee, who could be terminated for any reason (or no reason) at any time.

Although Illinois law "presumes that an employee hired for an indefinite period may be discharged at will for any reason, it also recognizes that employment handbooks have the potential to form contracts between employers and workers." *Moss v. Martin*, 473 F.3d 694, 700–01 (7th Cir. 2007) (citing *Duldulao v. Saint Mary of Nazareth Hospital Center*, 505 N.E.2d 314, 317–18 (Ill. 1987)).  But for that to happen, the language must be clear.  *Id.* (citing *Davis v. Times Mirror Magazines, Inc.*, 697 N.E.2d 380, 388 (Ill. 1998)).  And clear language can likewise preclude the formation of contractual rights and obligations.  *Id.*

Here, the Court finds that the Team Member Agreement did not alter Plaintiff's status as an at-will employee or contractually bind Defendant to employ any specific disciplinary policy in addressing her employment issues.  Initially, the Team Member Agreement comprises two sections, one listing the "commitments of the Team Member," and the other listing the "commitments" of the company.  [37-6]

at 2. The commitments of the company section says nothing about a disciplinary procedure. *Id.* The plain language of the contract thus belies Plaintiff's claim that Defendant was obliged to honor a specific multi-step disciplinary process before firing her.

Additionally, Defendant's Policy and Procedures Manual, which Plaintiff admits she read and understood, provides that employees "may be separated from the Company *with or without recourse* to the following disciplinary procedures: (1) Verbal warning of supervisor; (2) Written warning of supervisor and Human Resources Department - copy to be placed in employee's file; (3) Written report with days off with or without pay - copy to be placed in employee's file; (4) Discharge." [37-5] at 2 (emphasis added). The Manual further provides that "[a]ll violations of Company rules are subject to *any of the above mentioned penalties* depending on their severity." *Id.* (emphasis added). Plaintiff signed a statement indicating that she read and understood this particular provision of the Manual. *Id.* And, indeed, she testified at her deposition that she knew she was an at will employee and knew that the disciplinary measures spelled out in the Agreement need not be sequentially applied. [37-3] at 16. She testified that she knew she could leave the company at any time, and she knew that the company could let her go at any time. *Id.*

In short, Plaintiff offers no evidence to show that Defendant was contractually obligated to implement a specific disciplinary process in response to Plaintiff's refusal to work the flow line or submit a letter of intent upon return from her decision-making leave. As a result, her claim that Defendant breached such obligation necessarily

32

fails, and Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

## IV.  **CONCLUSION**

This Court grants Defendant's motion for summary judgment [34] and denies Plaintiff's request to amend her Title VII retaliation claim to substitute a state-law retaliatory discharge claim.  The Court directs the Clerk to enter judgment in Defendant's favor on all four counts asserted in Plaintiff's complaint.  Civil case terminated.

Dated: June 11, 2020                         ENTERED:

                                             John Robert Blakey
                                             United States District Judge